B. M. MARCUS ESTATE, Gladys L. Marcus, Leon J. Marcus, Richard E. Marcus and Robert M. Diggs, Executors, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Marcus Estate v. Commissioner
Docket Nos. 8577-72 & 8578-72
United States Tax Court
T.C. Memo 1975-9; 1975 Tax Ct. Memo LEXIS 360; 34 T.C.M. (CCH) 38; T.C.M. (RIA) 750009; January 15, 1975, Filed. Robert M. Diggs, for the petitioner. Louis J. Zeller, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent has determined a deficiency in the Federal income taxes of the Estate of B. M. Marcus in the amount of $20,474.05 for the year 1967 or alternatively in the amount of $22,009.60 for the *361 year 1968. We are asked to decide if in either of the aforesaid years the Estate of B. M. Marcus recognized forgiveness of indebtedness income under section 61(a) (12), Internal Revenue Code of 1954, as amended. [1]
FINDINGS OF FACT The petitioner herein is the Estate of B. M. Marcus (decedent), who died a resident of Olean, New York, on September 29, 1967. On November 27, 1967, the decedent's will was admitted to probate and letters testamentary were issued to his executors by order of the Surrogate of Cattaraugus County (New York). The principal office of the decedent's executors was in Olean, New York, when the petition herein was filed. No Federal income tax return was filed by the petitioner for either 1967 or 1968. Certain facts have been stipulated. We incorporate herein the stipulation of facts and the exhibits appended thereto. Olean Improvement Company (Improvement), a New York corporation, owned the building in which the family of H. W. Marcus operated the Olean House hotel. [2] H. W. Marcus, the father of the decedent, acquired the 1,150 *362 shares of Improvement stock outstanding in 1912. The corporation was to remain under the control of the Marcus family until its dissolution in 1971. As of April 6, 1929, H. W. Marcus ceased to have an interest in Improvement, having distributed his shares equally among his five children in a series of gifts. When one of the children of H. W. Marcus died in 1940, the interests of the four survivors, among them the decedent, were increased by the holdings of the dead child. In 1954 the decedent further increased his holdings by purchasing several shares from his sister. On February 14, 1961, the decedent made a gift to his three children of the 292 shares which he had acquired by reason of the events recounted above. On July 19, 1962, he transferred to his son, Richard E. Marcus (Richard), an additional 77 1/8 shares which he had purchased from his sister and her daughter. In March, 1965, the decedent's brother, Mendell V. Marcus, gave him another ten shares which the decedent surrendered to Improvement on May 6, 1967, in satisfaction of an outstanding obligation. From time *363 to time while it was under the control of the Marcus family, Improvement disbursed funds to the decedent, made charitable contributions in his name and paid premiums on policies insuring his life. It was not the decedent's practice either to pay interest on these amounts or to execute notes in acknowledgment of an obligation to reimburse Improvement for them; but Improvement did debit these disbursements to a loan account styled "111 - B. M. Marcus," and the decedent did not include these amounts in his gross income when computing his Federal income tax liability. [3]
In 1960 the books of Improvement were audited by an agent of the respondent. In the course of the audit he came across Account No. 111 and after an investigation concluded that the disbursements debited to the account were in fact distributions made with respect to the decedent's Improvement shares. The decedent maintained to the contrary that the disbursements were loans which he was unable to repay; but he later agreed to pay the deficiencies which the agent determined to be owing for the years 1957 through 1959. *364 The decedent paid Improvement the amounts debited to Account No. 111 for the year 1960 and when Improvement advanced him $200 a month from January 1963 through June 1964 decedent acknowledged an obligation to repay these amounts (which he discharged prior to his death), together with 5-1/4 percent interest, by executing two promissory notes. After the assessments had been made against the decedent for the years 1957 through 1959, he, together with his accountant, had entertained the notion of reducing the pre-1957 debit balance in Account No. 111 by various methods, among them repayment. [4] But finding none of the available alternatives satisfactory, the decedent resolved that the account should in no event be balanced by action of Improvement's board of directors lest he realize income in consequence of such action. Thus at the time of the decedent's death, Account No. 111 still showed a sizeable debit balance. Nevertheless, Improvement made no attempt to recover any amounts from the decedent's estate; and had it done so, the decedent's executors would have availed themselves of the protection afforded by the statute of limitations. *365 The decedent died indebted to the Exchange National Bank of Olean (Exchange National) to the extent of $17,737.67. His estate incurred funeral and administration expenses in the amount of $2,435.23. His gross estate included, interalia, the following assets: Asset
Value at date of death
Cash and Receivables
$11,678.29
Insurance Policies
1. Policy No. 398199,
Equitable Life Ins. Co.
of Iowa, payable to
Gladys L. Marcus and
Exchange National
1,015.64
2. Policy No. 727,516,
Provident Mut. Life Ins. Co.
of Phil., payable to Exchange
National
5,092.71
3. Prudential Ins. Co. of
America policy, payable to
Gladys L. Marcus
2,500.00
Stock
1. 109 shares, Standard
Oil Co. of Ca.
6,601.31
2. 105 shares, Texaco, Inc.
8,367.19
Total
$35,255.14
The estate also included 12 1/2 shares of stock (a 25 percent interest) in Olean House, Incorporated. In applying to the Surrogate of Cattaraugus County for a determination of the tax owing on the decedent's estate under Article 26 of the Tax Law (New York), the executors valued these shares at $1,000 each. Several years prior to decedent's death, Olean House, Incorporated, began to suffer a serious *366 decline in business. Late in 1970 Improvement sold the building which had housed the hotel to a purchaser who proceeded to convert the upper floors into apartments for the elderly. For several months thereafter, Olean House, Incorporated, leased the building's restaurant and bar facilities; but an attempt to operate them proved unremunerative. Consequently, in 1971 the members of the Marcus family sold the fifty shares of Olean House, Incorporated, outstanding for one dollar per share. [5]
By timely statutory notice dated October 12, 1972, respondent determined a deficiency in the Federal income tax of the decedent's estate for either 1967 or 1968. OPINION The respondent contends that the amounts debited to Account No. 111 with respect to the years preceding 1957 represented loans which Improvement had made to the decedent; and that the petitioner's obligation to repay such of those loans as were still outstanding at the time of the decedent's death, was forgiven by Improvement in 1967 or 1968. The petitioner contends that the decedent and his estate were at no time under an obligation to pay Improvement the amounts debited to Account No. 111. Alternatively *367 the petitioner contends that if such an obligation did ever exist, it terminated prior to 1967 or 1968. The record discloses that the decedent executed no promissory notes payable to Improvement, covering the amounts in issue; and that he neither was charged interest on those amounts nor made a systematic effort to repay them. However, in computing his Federal income tax, the decedent did not include those amounts in his gross income; and they were carried as receivables on Improvement's books. As the petitioner bears the burden of proving its contentions, we hold that the debit balance in Account No. 111 as of December 31, 1956, did represent an obligation of the decedent, still outstanding at the time of his death, Cohen v. Commissioner,77 F.2d 184 (C.A. 6, 1935), affirming Orders of the Board of Tax Appeals; Wiese v. Commissioner,93 F.2d 921 (C.A. 8, 1938), affirming 35 B.T.A. 701 (1937), certiorari denied 304 U.S. 562 (1938); Shephard v. Commissioner,340 F.2d 27 (C.A. 6, 1965), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 382 U.S. 813 (1965). *368 The forgiveness of an indebtedness is deemed to have occurred when it becomes reasonable to assume that the debt will probably never be paid, Bear Manufacturing 1974); Fidelity-Philadelphia Trust Co.,23 T.C. 527 (1954). The record herein discloses that while he lived, the decedent was determined that Improvement not appear to have forgiven its claims against him; that after his death, the decedent's executors did not intend to satisfy such claims as Improvement may have had against him; and that Improvement's management did not intend to enforce these claims against the petitioner. We therefore hold the petitioner's obligations to Improvement to have terminated as a practical matter at the time of the decedent's death in 1967. It remains for us to determine the amount of income realized by the petitioner upon the forgiveness of its indebtedness to Improvement. As a threshold matter we must ascertain the fair market value on the date of the decedent's death of the assets included in his estate. Bearing upon this matter is a controversy as to the value of the petitioner's *369 12 1/2 shares of stock in Olean House, Incorporated. In petitioning the Surrogate of Cattaraugus County to determine the tax owing on the decedent's estate under Article 26 of the Tax Law (New York), the executors valued these shares at $12,500. This valuation is not binding upon the petitioner in this proceeding, Hegra Note Corp. v. Commissioner,387 F.2d 515 (C.A. 5, 1967), affirming a Memorandum Opinion of this Court. We cannot agree with the respondent that this valuation was correct. Giving due consideration to the decline in business which Olean House, Incorporated, was then experiencing, we hold these 12 1/2 shares to have been worth a total of $1,250 and the decedent's gross estate to have been worth $36,505.14. The amount of the debt forgiven was $87,351.76, that amount being the debit balance in Account No. 111 on December 31, 1956. As the petitioner's total liabilities clearly exceeded the value of its assets prior to the forgiveness of its indebtedness to Improvement, it can have realized income on the forgiveness of that indebtedness only to the extent that the fair market value of its assets exceeded its total liabilities immediately following *370 the forgiveness, Haden Co. v. Commissioner,118 F.2d 285 (C.A.5, 1941) affirming Memorandum Opinion of the Board of Tax Appeals, certiorari denied 314 U.S. 622 (1941); Lakeland Grocery Co.,36 B.T.A. 289 (1937). In determining that excess, assets exempt from the claims of creditors under state law are not to be included among the assets of the estate, Rufus S. Cole,42 B.T.A. 1110 (1940). Accordingly, we hold that policies of insurance on the life of the decedent are not to be included among the assets of the estate insofar as the proceeds of those policies were made payable by specific designation to Gladys L. Marcus.[6]
*371 Decision will be entered under Rule 155 in Docket No. 8577-72. Decision will be entered for the petitioners in Docket No. 8578-72. Footnotes
1. All section references are to the provisions of the Internal Revenue Code of 1954, as amended.↩
2. The Marcus family operated the hotel through a corporate entity styled Olean House, Incorporated.↩
3. Credit entries to Account No. 111 bespeak no systematic effort on the part of the decedent to repay these advances. Indeed, the only credit entries made from 1946 through 1959 record Improvement's receipt of dividends on policies insuring the decedent's life.↩
4. As of December 31, 1956, Account No. 111 showed a debit balance of $87,351.76.↩
5. See section 6501(a).↩
6. Insurance Law of New York, Section 166
1. If any policy of insurance has been or shall be effected by any person on his own life in favor of a third person beneficiary, or made payable, by assignment, change of beneficiary or otherwise, to a third person, such third person beneficiary, assignee or payee shall be entitled to the proceeds and avails of such policy as against the creditors, personal representatives, trustees in bankruptcy and receivers in state and federal courts of the person effecting the insurance. If any policy of insurance has been or shall be effected by any person upon the life of another person in favor of the person effecting the same or made payable, by assignment, change of beneficiary or otherwise, to such person, the latter shall be entitled to the proceeds and avails of such policy as against the creditors, personal representatives, trustees in bankruptcy and receivers in state and federal courts of the person insured; * * * Section 166-a. Payment of proceeds Where the proceeds of a policy of life insurance hereafter delivered or issued for delivery in this state or payable according to its terms to two or more beneficiaries without designation in the policy or by endorsement thereof of the respective interests of such beneficiaries, the proceeds shall be paid to such beneficiaries in equal portions. * * *↩